**ATTACHMENT 7**

# HOLLAND & HART LLP
ATTORNEYS AT LAW

DENVER • ASPEN
BOULDER • COLORADO SPRINGS
DENVER TECH CENTER
BILLINGS • BOISE
CHEYENNE • JACKSON HOLE
SALT LAKE CITY • SANTA FE
WASHINGTON, D.C.

SUITE 1000
90 SOUTH CASCADE AVENUE
COLORADO SPRINGS, COLORADO 80903-1645
MAILING ADDRESS
P.O. BOX 2340
COLORADO SPRINGS, COLORADO 80901-2340

TELEPHONE (719) 475-7730
FACSIMILE (719) 634-2461

**Charles R. Lucy**
Of Counsel
(719) 475-6447
(877) 665-8036 Fax
clucy@hollandhart.com

May 9, 2003

SAFPC
1535 Command Drive
EE Wing, Third Floor
Andrews AFB, MD 20762

    Re: **USAF Academy Disenrollment, C/2C Christopher Berardi**

Dear Mr. Secretary:

  I have the privilege of representing C/2C Christopher W. Berardi in the matter of his appeal of his disenrollment from the United States Air Force Academy. As the former Staff Judge Advocate at the Air Force Academy, I have seen literally hundreds of disenrollment cases, and while I would never presume to advise you on the merits of any particular case, I would like to share my perspective with you regarding Cadet Berardi's appeal. Based upon that perspective, I am concerned that numerous defects in the processing of this case resulted in a tainted record that affected every stage of review of Cadet Berardi's file. The inevitable result of these defects is the disenrollment recommendation that is before you now for review.

### Command Influence

  The most disturbing issue raised by this case is the command influence that permeated its processing. On the evening of 19 October 2002, Cadet Berardi was arrested at the Notre Dame football game at the direction to Colonel Susan Slavec, 34 TRG/CC, for allegedly consuming alcohol. He was one of numerous cadets arrested by Colonel Slavec that evening as she patrolled the stands looking for misbehavior. However, she singled out Cadet Berardi and announced to everyone present, "...he is gone...he is out of here in 10 days!" According to the USAFA IG report concerning this disenrollment action, this comment was overheard by several witnesses who would later act on Cadet Berardi's case. The IG report goes on to say that while the officers in the chain of command did not hear these exact comments, they were aware of what they euphemistically called, "the spirit of the environment." Significantly, the IG report concluded its findings on this issue by saying, "The cadets felt this statement contributed to the tone for the rest of the process

# HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 2

concerning Cadet Berardi. That is why they recommended a harsh probation in efforts to try and satisfy their leadership."

Not surprisingly, the pressure of command influence snowballed following the TRG/CC's clear statement of intent regarding the need to disenroll Cadet Berardi. During the initial cadet review of his case, his AOC, Major Pleasants, told the review panel that he "always" recommended disenrollment in cases like this. (Involuntary Disenrollment Case File, p. AB#12) That is another reason that the cadets felt pressured to "satisfy their leadership." Colonel Slavec's influence on the chain of command became more obvious as they overrode cadet recommendations for a harsh probation, and forwarded the case for disenrollment consideration to the Military Review Committee (MRC). At this point, the Deputy Group AOC, Major Rose, who had previously recused himself for self-admitted bias (Involuntary Disenrollment Case File, p. AB#75), volunteered to testify before the MRC and proceeded to inject his personal bias back into the proceeding. While Major Rose had already annotated Cadet Berardi's probation journal entries and submitted his own MFR on the subject, he related that he just wanted to be present to "clarify" his remarks and "alleviate any concerns from the cadet's point of view." (Involuntary Disenrollment Case File, p. AB#76) This he did at great length and to Cadet Berardi's great harm, selectively picking the more negative pages of the journal out of context for comment. This deprived the MRC of an opportunity to see Cadet Berardi's tremendous personal growth during the journaling process. Inexplicably, the journal was lost, and many of its missing pages have never been produced for review. (Involuntary Disenrollment Case File, p. AB#107)

The IG report itself reflects the opinion of the presiding officer that he should not have allowed Major Rose to address the hearing. As the IG noted, "The Group AOC stated that his deputy, Lt Col Rose, took the journal entries too personal and sensed overreaction." Finally, Major Rose poisoned the proceedings even further by including information from an inaccurate police report regarding the events of 19 October 2002 in the MRC documentation. (Involuntary Disenrollment Case File, p. AB#72). Although Cadet Berardi's AOC submitted an MFR with corrected information, Major Rose never corrected his erroneous entry.

Command Influence is the mortal enemy of military justice and is prohibited by Article 37, UCMJ. By necessary extension, it is a violation of military due process in the administrative arena, and applies to "any other military tribunal." 10 U.S.C § 837(a). In this regard, each member of the MRC is expected to "...vote his or her conscience...." USAFI 36-164, *Review and*

# HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 3

*Disposition of Deficient Cadets*, 26 November 2000. Whenever a decision maker feels that their independent judgment has been influenced or that they are required to take a particular action, command influence has occurred. Statements made in reference to a particular case or individual can also constitute command influence if a desired outcome is requested. Command influence that produces an implied bias is just as destructive as command influence that produces an actual bias, U.S. v. Wiesen, 56 M.J. 176 (CAAF 2001); U.S. v. Youngblood, 47 M.J. 338 (CAAF 1997). The test for implied bias is whether a neutral public would perceive bias in the proceedings, Id..

In this case, Col Slavec's statement influenced the cadet and officer chain of command to make certain recommendations and take certain actions in Cadet Berardi's case that resulted in his disenrollment. The IG report concludes that the cadet review board made its recommendations in an effort to appease Colonel Slavec. Captain Pleasants and Major Rose were aware of her desires and acted to subvert the review process. As a result, the MRC record was tainted and was subsequently presented to the Academy Board and Superintendent for review in that tainted condition. The record upon which they acted was not only tainted but also replete with error as discussed below. If Cadet Berardi had received a fair hearing free from command influence, his case might not have even been presented to the Academy Board for review.

The Group AOC who said he should not have allowed Major Rose to testify had several easy solutions to the problem he created, including reconvening a new MRC or polling the MRC to determine if there was an issue of command influence. He did neither. Instead, he let the testimony stand uncontradicted and Cadet Berardi's case went on to its inevitable conclusion. In this case, both actual and implied bias were present. In the past, such cases have resulted in the reinstatement of the disenrolled cadet. (See, Involuntary Disenrollment Case File, Cadet Nieves).

## Due Process

Military due process requires that administrative proceedings be free from arbitrary and capricious actions and that military authorities not act in bad faith. Regrettably, the disenrollment record that has been assembled in Cadet Berardi's case is replete with error, innuendo and missing documentation. Inexplicably, no one in his chain of command took appropriate action to make the necessary corrections. The record went forward uncorrected, and decisions were made based upon inaccurate information. Unfortunately, the mistakes were significant and resulted in a denial of due process in Cadet Berardi's case.

# HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 4

At the outset, it should be noted that Cadet Berardi brought many or the errors discussed below to the attention of his chain of command, to no avail. As reflected in the IG report concerning his disenrollment, when Cadet Berardi told his AOC about the inaccuracies prior to the MRC, his AOC told him that there was nothing that could be changed. As the IG himself stated, "This was a false statement." Unfortunately, Cadet Berardi did not know this and the record went forward uncorrected. In this regard, the Involuntary Disenrollment Case File itself is replete with self-confessed omissions (See, pp. AB#17, AB#104 and AB#107) and errors (See, p. AB#46--Who is "HENRY"?—and AB#73—who is "Cadet McIntire").

One of the major errors that occurred in Cadet Berardi's case involved his Form 10 for a lost ID card. Ironically, he found his ID card in his room, presumably uncompromised, but was punished anyway. However, of more note is the fact that there was no consistent policy of punishment for this offense at the Academy, and other cadets received substantially less punishment or no punishment for the same offense. The IG substantiated this problem as well, and stated his doubt that there was even a verbal agreement as to a standard punishment. Even the Academy's attempt to answer the IG investigation with an e-mail policy statement casts doubt on the punishment Cadet Berardi received. His card was neither lost nor stolen, and therefore he should have received no punishment at all. Unfortunately, because of this "hit" Cadet Berardi had enough demerits in his file to place him on probation, setting him up for ultimate consideration by the MRC and disenrollment by the Academy Board and Superintendent.

Another significant error in Cadet Berardi's package involves the incident that occurred at the Notre Dame football game. That error involves the police report and its reference to the fact that Cadet Berardi was drunk and disorderly at the game. Cadet Berardi's AOC later submitted an MFR to the effect that Cadet Berardi had not been belligerent and in fact was very cooperative. There was also never any BAT conducted to determine the level of alcohol, if any. The report then goes on to refer to another individual by the name of "HENRY" who was more likely the belligerent person that evening. Unfortunately, the AOC's MFR did not correct the police report that was appended to the MRC record for review by the Academy Board and Superintendent. The erroneous police report was also repeated in Major Rose's summary to the MRC, and there is therefore a grave likelihood that the MRC made its recommendations based upon this erroneous report and that the Academy Board was confused as well.

# HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 5

Yet another serious error in Cadet Berardi's disenrollment documents occurred in the Military Review Committee Executive Summary. That summary refers to two alcohol related incidents, which seems misplaced in light of the fact that Cadet Berardi only has one incident involving the underage consumption of alcohol. If there had been more than one incident, the Cadet Counseling Center certainly would not have concluded that he did not have an alcohol problem. (Involuntary Disenrollment Case File, p. AB#111) The other incident apparently referred to involved a situation in which Cadet Berardi was a designated driver and was not drinking at all—hardly an alcohol related incident with respect to Cadet Berardi! (Involuntary Disenrollment Case File, p. AB#110) In a further attempt to confuse the issues, Cadet Berardi 's AOC has referred to three alcohol related incidents, in an obvious effort to aggravate the record in this case. The prejudicial effect of such statements on the decision making process in this case is clear, and deprived Cadet Berardi of a full and fair evaluation.

Another major irregularity in Cadet Berardi's disenrollment case concerns the journal entries he made while on probation. This journal is required as a tool for self-reflection and examination. Initially, Cadet Berardi's entries were very bitter, but as time went on, they began to reflect more maturity and insight. Unfortunately, those entries were seized upon by Major Rose as described above, who selectively used the worst ones as a weapon against Cadet Berardi at his MRC hearing. This was in spite of the fact that Cadet Berardi's AOC had signed off on the entries as acceptable. As the IG report notes, "...the cadet thought he was on the right track, only to have the AOC withhold any support during the process...." More significantly, the Staff Summary Sheet prepared prior to the Academy Board carries this prejudice forward, stating, "Cadet Berardi...denies learning anything from probation...." Such a statement is directly contradicted by later journal entries, but unfortunately, many of the journal entries were "lost" by the Academy, and even the IG has only a partial record. Obviously, such a negative characterization of Cadet Berardi's probation would have had an enormous impact on anyone evaluating his potential for further service at the academy.

Another error in the Academy Board Staff Summary Sheet states that Cadet Berardi is on athletic, conduct and aptitude probation. In fact, the IG report concluded that this was inaccurate and that he was only on aptitude and conduct probation. Since conduct and aptitude probation are somewhat related and Cadet Berardi had a cumulative military GPA of 2.58, the addition of another probation to his record would have been significant to the Academy Board.

HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 6

While I could go on at this point describing the errors in Cadet Berardi's disenrollment package, the cumulative impact of these errors is clear. Through various acts of commission, omission and administrative error, a record was created that assured disenrollment. As each layer of review took its action on flawed facts, the credibility of the disenrollment process was reinforced. That record is now before you, and I would ask that you regard it with caution as you consider what weight to give the "facts" it contains.

### Fundamental Fairness

The entire disenrollment process at the Air Force Academy is designed to be non-adversarial to ensure that it is fair to all involved and develops an impartial factual record, AFI 36-2020, *Disenrollment of United States Air Force Academy Cadets*, 22 April 1999. Unfortunately, the safeguards that were supposed to be in place failed, and the process became extremely adversarial and biased. The one person who could have made a difference, Major Pleasants, failed to do so. Sadly, the IG concluded that, "AOC support to this cadet was lacking." "...[T]he preponderance of evidence showed that Cadet Berardi's AOC wrote off the cadet and provided minimal assistance or support. Support from the MTL was nonexistent...." Major Pleasants himself admitted that he "screwed up" by not administering Cadet Berardi's monthly counseling in a consistent manner. However, he did not hesitate to issue a blank Form 10 to Cadet Berardi for a missed counseling and attempt to include it in the disenrollment package in one last effort to "poison the well" in Cadet Berardi's case. When Cadet Berardi indicated he would challenge the Form 10, Major Pleasants threatened to add two more. As noted above, Major Pleasants even approved Cadet Berardi's journal entries and then failed to take any responsibility for the process when it was used by Major Rose to assassinate Cadet Berardi's character.

Cadet Berardi would be the first to admit that he is not perfect. However, I am struck by the fact that he is not a marginal cadet academically, militarily or athletically. We have all seen cases where "problem" cadets are usually deficient in more than one area when they are identified for disenrollment. This is not the case with C2C Berardi. His 3.25 GPA, 2.9 MPA (before the mandatory downgrade for probation) and 2.46 PEA all reflect a talent and potential for leadership that argue for his continued enrollment as a cadet. In fairness, most of the actions that led up to this point are minor in nature, and not indicative of his true officership potential. Finally, the 48 letters of recommendation in C2C Berardi's file are also unusual in the sense that most "marginal" cadets cannot muster more than two or three letters of support. These letters are remarkable for their quality and sincerity, and are

# HOLLAND & HART LLP
ATTORNEYS AT LAW

HQ SECAF
May 9, 2003
Page 7

more reflective of C2C Berardi's background and character than the MRC file with its missing and inaccurate data entries. This is not another bad cadet, but rather an individual with true potential for future service. In this regard, his Military Performance Evaluation from First BCT says it all, "Outstanding First Sgt!!!...He motivated the basics both militarily and athletically. He went beyond the boundaries of his duties to improve the squadron as a whole." (Involuntary Disenrollment Case File, p. AB#90).

## Conclusion

When Cadet Berardi's parents contacted BG Weida's office on 8 May 2003 to check on the status of a requested meeting concerning the handling of their son's case they were told that the general would not entertain a meeting because, "The Academy is preparing young men and women to stand on their own. Their parents will not be on the battlefield with them." In light of the above discussion, Cadet Berardi respectfully requests that you stand on this battlefield with him, since his parents cannot, and no one else has had the courage to do so. All he is asking is a chance to graduate from the Academy and serve his country. He is already assured that he will not graduate with his class, which as you know is a harsh penalty. He simply asks that you disapprove this recommendation for disenrollment and let him fight his way back to graduation and a commission on a level playing field.

Sincerely,

Charles R. Lucy
Of Counsel
for Holland & Hart LLP

CRL
Enclosures
1. Cadet Berardi Appeal Letter to SECAF w/ Transcript, May 8, 2003
2. Cadet Berardi Letter to Congressman Reynolds, May 8, 2003
3. Mr. and Mrs. Berardi Letter to SECAF, May 9, 2003
4. Mr. and Mrs. Berardi Letter to SECAF w/ Atchs, May 8, 2003
5. HQ USAFA IG Report w/ Atchs, May 3, 2003

cc:   Mr. and Mrs. Tony Berardi

3081145_1.DOC